Mr. Dubofsky, you have reserved 3 minutes for rebuttal. That gives you 7 minutes to begin, so the floor is yours. Thank you. Good morning, and may it please the Court. My name is Mark Dubofsky. I represent the plaintiff in this case, Catherine Alexander. With respect to Your Honor's question, the Supreme Court asked the same question in the Unum v. Ward case. Justice Scalia said, is it unum or unum? I believe it's pronounced unum, but counsel will correct me if I'm wrong. Yeah, I think that's the way I've been thinking, and it only matters when you're using sort of a or an if you, I guess, are leading up to the word. But anyway, go ahead. So we are here this morning because we contend that the district court made at least four errors that influenced the outcome of this case. The first was the court's decision that Ms. Alexander failed to prove her disability through the entirety of the short-term disability period. That finding is logically impossible, because Unum approved her claim for the entirety of that period, thus conceding that she met the qualification standard, which was identical in wording to the long-term disability definition of disability. But by that approach, then, anybody who gets short-term disability is entitled to long-term disability as well, right? Absolutely not.  The defendants cited a number of cases for that proposition and questioning the conclusion that Your Honor's question leads to. In all of those cases, there was evidence that the claimant's condition had improved in the interim. All of those cases but one were decided under the arbitrary and capricious standard of review. This case was decided under the de novo standard of review, and there was no evidence that Ms. Alexander's condition improved. There are several policy implications that are raised by the issue that the defendant is contending that the approval of the short-term should not necessarily lead to approval of long-term disability. The first is that it inverts ERISA's protective purposes, because what it does is it sets a trap for claimants. Claimants who are approved for short-term disability are lulled into believing they don't need to produce any new evidence during the short-term disability period. And that, in fact, led to the court's second error, which was the district court's refusal to consider evidence beyond the date of the elimination period. What that implies is that claimants can never prove their disability if they're denied, because invariably when somebody is receiving ongoing medical treatment, they're going to collect new exam findings, new treatments, and whether those treatments have been successful or have failed. And that's exactly what happened in this case. So, you know, Unum has contended repeatedly that Ms. Alexander lacked sufficient objective evidence or test results that supported her claim. But they never asked for them. And we cited the Tenth Circuit Gator decision for the proposition that Unum was the fiduciary, and that if there was additional evidence that they needed to receive in order to approve Ms. Alexander's claim, they needed to ask for it. Are you, in some ways, it sounds like, excuse me, almost flipping the burden. I mean, if Unum feels like we have the information we need and the information we need does not establish that she's entitled to disability, why isn't it the burden then on her to provide that? I mean, it's not as if they said, you know, we just, we don't have enough information. They said we have all this information, and on our review of it, she's not eligible. They're not obligated to say, well, we don't think you're eligible, but hey, give us some more information. Maybe we'll change our mind. They did say they needed more information. They said the information didn't support approving it. They didn't say we need more information to make a decision, did they? They did not. But the problem is the nature of Ms. Alexander's disability, long COVID. It's one of those conditions that they don't profile on doctor shows, on television, because there are no tests. There are no way, there's no way to verify the symptoms. But the, for instance, the... But you could, I mean, there are at least some opportunities to measure functional limitations, right? Not really. The consensus diagnosis for long COVID from the National Academy of Sciences and Medicine indicates that there are no laboratory tests. You know, Ms. Alexander consistently... But not laboratory tests to see, you know, if you, to test positive because of, you know, some litmus test or something. But, you know, if you're saying that you are physically unable to do various things, that can't be evaluated? No. No? Because there is no test to measure fatigue. There is no test to measure post-exertional malaise. There is no test to measure the brain fog. Dr. Hanant and Dr. Nadelson both pointed out that the type of tests that one would expect, such as a mental status exam, or even a neuropsychological evaluation, is not well suited in a case involving long COVID, because the condition is immeasurable. In fact, in one of the cases that we cited, the Abrams versus Unum case from the Western District of Washington, Mr. Abrams, he took a neuropsychological test, and it didn't show any indication that he had a cognitive impairment. But the court was still impressed by his credibility. I mean, this is basically a credibility case. So what would be the value of us considering the post-elimination period evidence? When you say that that was an error not to consider it, it feels like you're saying, if only the district judge had, the judge would have seen X. That would have changed his mind. But now you're saying that there is no sort of objective test. So what is it that would have changed? So it ties in with the argument that we made citing the case of Diaz versus Prudential, that the ongoing effort to seek treatment, she was seeing one doctor after another in the hope that one doctor would be able to say, this is what you need and this is going to make you better. That could have changed the outcome. The fact, if the evidence revealed, and you're saying it doesn't, I'm not sure that's right, but if the record, if the district court considered that she kept seeking treatment after the elimination period, that fact alone would alter the calculus about whether she was completely disabled during the elimination period? Certainly. Regardless of what the outcome of those visits were. It would bolster her credibility because it shows her efforts to get better, and that ties in with her outstanding work record. The last point I want to make, if I can have some additional time, is that there's a serious procedural error in this case. The ERISA regulations invite claimants to respond to new evidence that the insurance company develops during the claim appeal, and we did that. And UNAM never evaluated that evidence. It's obviously clear that they didn't because we had sent the wrong letter from Dr. Hanant, even though we specifically referenced the March 2023 letter. Nobody ever reached out and said, hey, we didn't get the right letter. Can you send it to us? Or was there any discussion of the report from Dr. Nadelson and the other information that we submitted in our rebuttal? So I'll reserve the rest of my time if I still have it. Thank you. All right. Thank you. We'll now hear from Mr. Wolonek. Am I pronouncing that right? That's correct, Your Honor. Oh, good. Two for two. All right. You may proceed. Thank you, Judge Sullivan, and may it please the Court, Cato Wolonek for UNAM Life Insurance Company of America. Under Rule 52, the district court reviewed the entire record, weighed the evidence to NOVO, and found that plaintiff was not totally disabled during the elimination period. The argument my friend raises this morning, try to either shift the burden of proof onto UNAM, as Judge Lee, you pointed out, or they would have this court review the evidence to NOVO once again. But on an appeal from a Rule 52 bench trial, this court reviews factual findings only for clear error, and the district court's findings here were correct, not clearly erroneous. I'd like to start with the short-term disability benefits. The district court noted that UNAM had paid those benefits, but then it reviewed to NOVO whether plaintiff was actually totally disabled during the elimination period. There's no estoppel, there's no burden-shifting presumption that would require us to show an improvement that would relieve plaintiff from her burden to prove that she was totally disabled and require us to disprove it. That's not what this court's precedent holds. Plaintiff bears the burden. But we explained on page 1344 of the sealed appendix why there was a different conclusion on the long-term disability benefits versus the short-term, and that's that we had more time to gather information. Medical records pertaining to the elimination period were still coming in after the elimination period. I believe we didn't get nurse practitioner latence records until June. We then had experts review it, reached out to nurse practitioner Layton, to Dr. Hynand, gathered that information, and on that holistic review, determined that plaintiff was not totally disabled and had not met her burden. We gave plaintiff the benefit of the doubt while that review was ongoing, but that was for short-term disability benefits, which serve a very specific purpose of getting money quickly to the claimant because bills might be due, it's only a seven-day elimination period, there's no preexisting condition exclusion. We gave plaintiff the benefit of the doubt while that review was ongoing, and that shouldn't be held against us and require us to prove that she improved when, in fact, we just got more information during that period and had the experts review it. And then Judge Reyes reviewed the evidence to Novo and found that plaintiff was not totally disabled, and that's correct and not clearly erroneous for at least seven reasons. One is the physical exams, the way that she presented to her treatment providers. I think the physical therapy records are particularly notable here. Plaintiff saw her physical therapist more than any other treatment provider during the elimination period, said that she had walked six blocks to her last appointment. There's a reference in one of the records that she asked for a different walking program because the one that she had was not challenging enough. That's on page 762 of the sealed appendix. And so we have plaintiff's normal test results. And, Judge Sullivan, to your point, there is a difference between a disability and a diagnosis. There might be difficulty in objective tests in terms of reaching a diagnosis, but it absolutely is possible to test physical and cognitive limitations. There are tests available, walk tests, stress tests, cognitive tests. Dr. Winkle pointed these out in his report. And I don't read plaintiff's treatment providers to dispute that these tests exist, just that they didn't perform them. Plaintiff could have had a functional capacity exam, but either she didn't or we don't have the records of it because she didn't tell us about it. And so the objective limitations of plaintiff's inability to work, that type of evidence is possible and it's not here. And the district court was right to consider that in weighing the evidence, looking at her subjective symptoms, self-reports on one hand. The district court didn't discount those as categorically irrelevant, but it did discount them in weighing the evidence because they weren't borne out by objective evidence that could have been brought but was not. The timing of the records is also significant. Plaintiff saw most of her treatment providers, or at least many of them, after the elimination period began or ended, rather. It's not just that she saw them after. It's that she didn't see them before. These are new treatment providers. Maybe she saw them once or twice after the elimination period had ended. And in weighing the evidence, it's not clear error to give those records less weight, particularly when you have demonstrated capacity of being able to work for 21 months after the COVID symptoms reportedly began. That includes eight months after the long COVID symptoms reportedly began, two months after she told Dr. Hynut that she planned to take herself out of work. I agree that the record shows that plaintiff's work performance was excellent, but that works in our favor. It's not that plaintiff was falling behind at work during those 21 months or the eight months or the two months. She was performing excellently, according to the record, and that is inconsistent with the claim that she was disabled and unable to work. The treatment that was also provided is conservative. Dr. Solis pointed that out. Low doses of medication, being told to take Zyrtec instead of taking Pepcid. And that is part of the overall picture. There's five expert reports, Dr. Batia, Dr. Burstein, and his letter, Dr. Solis, Dr. Medrick, Dr. Winkle, all reviewing these records and finding that plaintiff was not totally disabled. And all of this is against the backdrop that the physical performance, physical aspects of the occupation are light. It's not to say that they're unimportant, but they are a light duty. The cognitive aspects are more significant. But on the cognitive point, nurse practitioner Layton agreed with Dr. Burstein that plaintiff was not totally disabled from the cognitive aspects of her job. That's on page 844 of the sealed appendix. Dr. Batia, Dr. Winkle, they also reached this conclusion. And there are cognitive tests that could have been taken. The Montreal cognitive assessment that Dr. Winkle pointed out, that's possible. Plaintiff's own report submitted as part of the appeal notes that that test is available on page 1172 of the record. And so we have all of this. We have the normal presentation to Dr. Hyman. The records from October and December, February, April, and June. In the symptoms that plaintiff was presenting with, not in the self-reports, but in what the treatment provider was recording, they don't mention any fatigue in that list of potential symptoms. They did on the first visit. They did later. But for those five visits that encompass before, during, and after the elimination period, there was no such report. And so with all of this, the district court didn't clearly err when it weighed the evidence and found that plaintiff was not totally disabled. We didn't ignore any of the evidence. The district court didn't ignore any of it. On page 42 and 43, district court walked through evidence from after the elimination period. As far as the need or saying that we should have gone out and asked for the letter from Dr. Hyman, this is dated from March of 2023. We did point out on page, I think it's 1347, 1345 of the record, that the letter that was attached to the appeal submission was dated differently. The parties then, in litigation, agreed that they would limit themselves to the administrative record. There was never a motion to supplement the administrative record. The letter from Dr. Hyman was simply attached to the proposed findings of fact. It's not in the appendix on appeal. I don't think it's properly presented to this court. But even if there were a procedural error, that would at most mean that the district court would review de novo. That's what this court's decision in HALO says, is that maybe if there's a procedural error, you review de novo instead of for arbitrary and capricious review. But we have de novo review here anyway. The district court had the entire record, reviewed it, and made a factual finding that's not clearly erroneous. And then as far as the Gaither case that my friend mentioned from the Tenth Circuit, this court in Roganti noted that any such rule from Gaither would be narrow. Gaither itself called it a narrow rule. And there you had an administrator that never bothered to ask what the disabling condition was. That's a very different situation from what we have here, where we affirmatively went out and gathered records, asked the treatment providers for their reviews, got that considered. It had experts review. There's simply nothing more that we needed. Plaintiff bears the burden of proof. And this court has said that the fact finder may look for objective evidence. That's the Hobson case. And so it's perfectly fine for the district court to discount this objective treatment and find that plaintiff had not met her burden. And I think unless this court has any further questions, the district court made factual findings. Those findings are not clearly erroneous. And this court should affirm. All right. Thank you, Mr. Wallenach. Mr. Dubofsky, we'll hear from you for three minutes of rebuttal. Thank you, Your Honor. The tests that were suggested by Dr. Winkle were all red herring tests. The Montreal Cognitive Assessment Test is a very gross test that's administered to see if somebody might have early symptoms of Alzheimer's disease. Dr. Henant and Dr. Nadelson both rejected the tests that Dr. Winkle had suggested as not being relevant to a claim for long COVID. With respect to the physical therapy, both Dr. Henant and Dr. Toh recorded that Ms. Alexander had told them that she discontinued the physical therapy because she would go to a session and then go to sleep for 12 hours because she was so exhausted and it wasn't helping her in any material way. With respect to Unum's excuse that the difference between the short-term and the long-term disability is that they had more time to review the record, that's an excuse. It's not an explanation. The Supreme Court in MetLife v. Glenn said that ERISA plan administrators are obligated to employ higher-than-marketplace quality standards. That doesn't mean that they only employ them when they review long-term disability benefits. It means they employ them throughout the process. And the fact that they approved the short-term disability after consideration of the evidence and there was no improvement in Ms. Alexander's condition suggests that Unum made an erroneous decision with respect to the long-term disability when more money was at stake and it affected their bottom line even further. And for those reasons, we're asking the court to reverse the court below. Thank you, Mr. Dubofsky. And Mr. Wallenach, we will reserve decision.